## JOSEPH GRUBE, BY HIS NEXT FRIEND,

### *vs.*

## THE MAYOR, &c., OF BALTIMORE, ET AL.

*Negligence: electric company; spikes on poles; no invitation to stranger to climb.*

The placing of spikes in the poles of an electric company, by which the employees ascend to examine and repair the lights, is not such an implied invitation or attractive nuisance as to render the company liable to a stranger who climbs up thereby and sustains an injury.                         p. 359

Such a pole was erected in the yard of the grounds of a public school in Baltimore City; one of the boys climbed up and was injured by the electric current; *held,* that neither the Electric Light Company nor the Mayor and City Council was liable.                         p. 360

*Decided February 27th, 1918.*

Appeal from the Baltimore City Court.    (HEUISLER, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER and STOCKBRIDGE, JJ.

*Joseph S. Goldsmith* and *Jacob M. Moses,* for the appellant.

*S. S. Field, the City Solicitor,* and *E. M. Sturtevant,* for the appellees.

Boyd, C. J., delivered the opinion of the Court.

Joseph Grube, a boy between 10 and 11 years of age, sued the Mayor and City Council of Baltimore and the Consolidated Gas Electric Light and Power Company, of that city, for injuries received by him as a result of his climbing upon a pole in a schoolhouse yard owned by the city, which had been planted there by what we will speak of as the Consolidated Company. The yard was used as a playground by the children who attended the school and others. There was an iron fence around it about four and a half feet high, and about four years before the accident the pole was planted in the neighborhood of a foot from the fence, for the purpose of carrying electric current to the building. The pole was twenty-six feet high, and had two crossarms on it at the top, upon which there were wires. There was a small iron pipe which ran along the pole, into which the wires were run and then under the ground in conduits into the schoolhouse. Originally there were spikes in the pole from the ground towards the top for the employees of the Consolidated Company to climb upon, as is customary. The yard was divided into two parts—one side being for girls and the other for boys. The pole was on the boys' side. The evidence shows that at one time gates in the fence were kept locked when the ground was not intended to be used, but the locks were broken off and for some time before the accident the gates were left open. Boys played in the grounds after school hours, on Saturdays and holidays, and they frequently climbed on the pole. A man described as the engineer at the school, who was called as a witness by the plaintiff, testified that about a year before the accident he and the superintendent pulled the spikes out of the pole far enough above the ground to prevent the boys from reaching them, so as to keep them off the pole. In answer to a question whether the plaintiff could reach spikes from the top of the fence, that witness answered: "Hardly; I can not reach it myself." But the plaintiff testified that, "I got on the fence and then got hold of the pole,

and just swung myself out to the foothold and then climbed up to the top and then got on the sill." In another place he said: "I held my hand up and got hold of the fence and then put my hand on the pole, or little pipe, and then swung myself around to the foothold and was around there and then climbed up." Again he said: "Q. What kind of a foothold do you mean, those iron spikes? A. Yes. Q. About how high above the fence was the first spike; could you reach it from the fence when you were standing on the fence? A. Yes. (The Court): You were standing there on the top of that rod and you reached up and took hold? (The Witness): I could reach up my hand and take hold of this here. (Mr. Sturtevant): Take hold of the pipe, do you mean? (The Witness): The pipe, yes; and then swing myself around. I could reach the spikes, and I put my feet between this pole and then climbed up and sat on here." He then got up, and apparently was resting on the crossarm and probably with his foot on a spike. In some way he slipped, and in doing so grabbed a wire and soon fell to the ground. His hand was badly burned and he had what is called "a stellate fracture" of the skull, which is a fracture running in different directions. He was unquestionably badly injured.

The boy had climbed on the pole to watch a game of baseball. The accident occurred in August, during the summer recess of school. The evidence shows that boys had frequently climbed the pole and were constantly being driven from it. This boy had climbed it before, although it was not shown whether he had been driven away. He said: "Sometimes I climbed up there for kites and then I climbed up there just for fun." He said he saw other boys climbing up the pole for kites and they did not get hurt, so he started to climb up and he went up there that evening to watch the game.

It could scarcely be contended that either of the defendants was guilty of negligence, or would be liable to an adult of ordinary intelligence who was injured under similar cir-

cumstances. There can be no more reason for holding the defendants liable for this injury because the pole was a foot inside of the fence than, if it had been on the outside of the fence, on the pavement. Indeed, if a comparison be made as to which would be most dangerous much could be said to show that a pole on the outside might be. It would not stop boys from climbing, to see a baseball game or for other purposes, and there would be other dangers on the highway which would not be as imminent on the inside of the fence. If the pole had been erected on the highway to carry the electric current to the school building and someone had been hurt by it, it might have been argued that it ought to have been in the yard. But the decision in *Stansfield* v. *C. & P. Tel. Co.,* 123 Md. 120, conclusively establishes the fact that there can be no liabiltiy in this case, unless there must be some exception to the general rule there clearly announced, by reason of the age of the plaintiff. In that case the pole supporting wires carrying electric current for telephone and lighting purposes was in one of the highways passing through Ellicott City, and was in front of the dwelling occupied by Harry Stansfield and his family. There were spikes in the pole, intended for the use of the defendant's employees, and it was alleged in the *narr.* that various persons, including Harry Stansfield, as the defendant well knew, had been accustomed to use the spikes to climb the pole, in order to recover personal property and for other purposes; that the defendant negligently permitted the insulation on some of the wires to be insufficient. A pet kitten of the children of the unfortunate man had climbed on the pole and, the children being greatly distressed, he, "relying upon said invitation and representation of the defendants, ascended the pole by means of the spikes for the purpose of recovering the kitten and satisfying his children"; that the spikes, being conveniently arranged for such use, operated as an invitation to the public, and more particularly to the owners and occupiers of abutting properties to ascend the pole by means of the spikes,

whenever they might have occasion to do so for any proper purpose, and that the spikes constituted a representation that the ascent of the pole might be accomplished with safety; and that he, relying on the invitation and representation, and being ignorant of the hidden danger, came in contact with insufficiently insulated wires and in consequence of the contact was instantly killed. A demurrer to the *narr.* was sustained, and the appeal was taken from a judgment entered on the demurrer for the defendant.

We held, JUDGE URNER delivering the opinion, that the principle of implied invitation was not applicable; that the alleged permissive use of the pole by the deceased and others might relieve them of the character of trespassers, but would leave them in the position of mere licensees to whom the defendants would owe only the duty to avoid exposing them willfully to the risk of injury, and in a forcible opinion it was clearly shown that there could be no recovery. JUDGE URNER pointed out the distinction between that case, "where the injury occurred at a place intended for exclusive possession by those maintaining the fixtures alleged to be unsafe, and the class of cases in which the appliances causing the injury were so placed as to be dangerous to persons who might be reasonably expected to come in close proximity to them while occupying adjacent premises or positions." He cited *Ziehm* v. *United Electric L. & P. Co.,* 104 Md. 48; *Brown* v. *Edison Electric Co.,* 90 Md. 400, and other cases. He concluded the opinion by saying that where, as in that case, "those engaged in the distribution of electric current have placed their wires above and beyond the sphere of peril to the public and to the occupants of neighboring premises, it would be subjecting them to an unduly strict responsibility to require them to provide against the possibility that their own appliances might be utilized by strangers as a means of access to the conditions which proved to be injurious."

In this case it is said the plaintiff had the right to be there, but while he had the right to be in the yard he had no

right to get upon the pole. Mr. Stansfield had the right to be on the street, but not on the pole, unless as a mere licensee. This unfortunate boy not only had no right on the pole, but boys had been driven from it so frequently that it would be impossible to believe that he did not know it was not permitted, if the evidence of the witnesses is correct in regard to the frequency of the times when they had been run off or ordered away. But the spikes had been removed from the lower part of the pole for the very purpose of preventing the boys from climbing upon it. Whether plaintiff's own witness, Joseph H. Frank, was correct in saying that the plaintiff could not have reached a spike from the fence, or whether the boy was altogether accurate in his testimony as recorded, when in one place he said he did reach a spike, is not very material. When his whole evidence is carefully considered, especially in connection with that of Mr. Frank, it is much more probable that what he did, if not what he meant, was that he caught hold of the pipe through which the wires were conducted to the ground, then swung around the pole, perhaps getting part of his foot between the pipe and the pole, and finally reached the spikes. It would not be a remarkable feat for a boy 10 or 11 years of age, with the aid of the pipe, to thus climb up a foot or two until he reached a spike. But giving his evidence the broadest meaning possible, the uncontradicted fact is that spikes had been removed from the lower part of the pole, so a boy could not reach one from the ground, and everything that could reasonably be expected or required was done, unless it be that the pole was not removed. There was, in our judgment, no obligation on either of the defendants to remove the pole. If there had been no spikes on it, some enterprising boy like the plantiff might have attempted to climb it, but there must be some limit to the liability of parties lawfully conducting their business, both to boys and others. If there had been a tree where this pole was, the plaintff might have climbed up and

fallen from it, but the city would not be liable for not having taken the tree down.

There is nothing in the record to show that the plaintiff was mentally deficient for one of his age. Something was said about his grade in school, but if that was below what it ought to have been, it is not shown that it was by reason of any deficiency of mind. He may not have been studious; he may not have had the benefit of any instruction or assistance at home, or it may have been for various other reasons. Some boys in the lowest grade of a school can easily excel those in the highest grades in climbing, playing, etc.

It may be that in some jurisdictions such a case as this would be required to be submitted to the jury, but there is no decision in this State which would have required or authorized such submission. Children should receive all reasonable protection from the courts, but however much such an injury as this boy sustained is to be regretted, it does not justify mulcting innocent people or corporations in damages for injuries sustained by a boy over ten years of age who had no right to do what he did do, and who did it in a way that shows he knew he had no right to do it. Parents are sometimes so situated that they can not have such supervision over the movements of their children as may be desirable, but they can not turn them loose and then make other people pay for injuries they bring on themselves, when they are old enough to take care of themselves. The doctrines of attractive nuisances, implied invitations, etc., may be justly applied in some cases, but in this case we can find no just or reasonable ground upon which a recovery can be had. *Simonton* v. *Light & Power Co.,* 28 Tex. Civ. A., p. 374, 67 S. W. 530, referred to in *Stansfield's case,* and other decisions might be cited, but we do not deem it necessary or desirable to discuss the various authorities referred to, as after a careful consideration of the facts and the law as settled by our own decisions we are of the opinion that there can be no recovery.

*Judgment affirmed, with costs to the appellee.*